**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| IOENGINE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Civil Action No. 7:26-cv-00440<br><br>JURY TRIAL DEMANDED |

# COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff IOENGINE, LLC ("IOENGINE") files this Complaint against Defendant Apple Inc. ("Apple"), and in support thereof alleges as follows:

## NATURE OF THE ACTION

1. IOENGINE's founder, Scott McNulty, has spent his career developing, commercializing, and marketing cutting edge technology. Fresh out of college, Mr. McNulty's first job was at a Madison Avenue advertising agency. Though he worked on award-winning campaigns for clients ranging from Coca-Cola to W.R. Grace, he found himself gravitating to projects focused on the latest consumer technology products. This experience led him to develop advertising campaigns for some of the era's most important technological innovations, including the first filmless camera, an early cellular telephone, and a new generation of televisions. His work earned some of advertising's highest honors, including multiple Clio Awards and the prestigious Gold Lion at the Cannes International Advertising Festival.

2. In the early 1990s, Mr. McNulty was recruited away from advertising and into product development at a major technology company. There, he served as the product manager

for the Zip drive, a highly portable data storage system whose disks stored 70x the amount of data and were 85x faster than existing floppy drives. That work immersed him in the data storage technologies of the day, and set the stage for the inventions at issue in this case.

3. While attending the Consumer Electronics Show in 2001, Mr. McNulty saw data storage devices implementing the then just-released USB 2.0 standard. He recognized that these small USB keys—each with its own processor, memory, and storage—were not merely hard drives, but computers in their own right. This led him to ponder the implications of cheap, tiny computers everywhere.

4. But he soon realized that a computer the size of a USB stick was too small to have its own input/output mechanisms, such as a keyboard, mouse, or screen. This posed a challenge. Miniature computers would be of limited use if you could not meaningfully engage with them. The apparent solution, connecting the small device to a larger host computer, created a different problem. Under the then-ubiquitous control paradigm, giving a host computer access to a portable device meant surrendering the portable device to the host's complete control, and with it the security of the data the device carried.

5. Mr. McNulty took a different approach. He conceived of a portable device that carried its own processing and memory resources and was specially programmed so that it could communicate with, and even commandeer, a larger device (such as a desktop or laptop computer). This would allow the devices to retain the benefits of being small (e.g., extreme portability), but also accessible through traditional user interfaces, all while safeguarding the device's data.

6. Mr. McNulty also anticipated that data would increasingly live on network servers instead of local drives, and that his new class of portable devices would therefore need network access. So he developed the software and communication protocols that let a portable device

"tunnel" through a larger device and use its network connection—or, if necessary, access those same resources using the portable device's own network connection—in each case without compromising the security of either device.

7. Mr. McNulty founded IOENGINE to commercialize these inventions. The name reflects the central concept: an engine for the input and output needs of a new class of highly portable computing devices. IOENGINE hired engineers, built dozens of working prototypes, and disclosed its work to the public through the patent system, which has issued IOENGINE more than 15 patents.

8. What Mr. McNulty invented in the early 2000s enables Apple's modern portable products. An Apple Watch, a pair of AirPods, an iPhone, and an Apple TV are each a highly portable computer with its own processor, memory, and storage. Each is set up and operated through an interactive user interface presented on a larger, familiar screen: the touchscreen of a paired iPhone, the built-in display of a vehicle, or a television. Each reaches Apple's servers and third-party servers through the network connection of the device it is paired with, through a network connection of its own, or both. And each does so securely, so that the data it carries about its user is protected in transit. Apple's portable device businesses are built on precisely the architecture and protocols that Mr. McNulty conceived, disclosed, and patented.

9. The patent system is designed to encourage innovation and the disclosure of new ideas by granting inventors exclusive rights to their inventions for a limited period in exchange for teaching the public how those inventions work. Those rights reward individual ingenuity, and they preserve a marketplace in which technological progress is driven by creativity and merit. Apple has made extensive, unauthorized use of IOENGINE's patented technology without seeking a license or paying compensation. This case seeks to ensure that the rights of the inventor are

acknowledged and respected.

## THE PARTIES

10. IOENGINE is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 22 Ensign Road, Norwalk, Connecticut 06853. IOENGINE was founded by Scott McNulty, the sole named inventor of the patents asserted in this action, and IOENGINE owns those patents.

11. Defendant Apple Inc. ("Apple") is a corporation organized and existing under the laws of the State of California, with its principal place of business at One Apple Park Way, Cupertino, California 95014.[1] Apple "designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories," including the iPhone, the Apple Watch, and AirPods, and markets Apple TV as its media streaming device.[2] Apple designs, makes, uses, imports, offers for sale, and sells the products accused of infringement in this Complaint throughout the United States, including in this District. On information and belief, Apple may be served through its registered agent in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

12. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100 *et seq.*, including but not limited to 35 U.S.C. § 271.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

---

[1] *Apple Inc., Annual Report (Form 10-K) for the Fiscal Year Ended September 27, 2025*, U.S. SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/Archives/edgar/data/320193/000032019325000079/aapl-20250927.htm (last visited Sept. 25, 2026) (Ex. 6).

[2] *See id.*

14. This Court has personal jurisdiction over Apple. On information and belief, Apple is subject to this Court's general and specific personal jurisdiction consistent with due process and the Texas long-arm statute, due to its (i) substantial and continuous business in this forum, including the commission of at least a portion of the infringing acts alleged herein; (ii) maintenance of regular and established places of business in this District; and (iii) regularly doing or soliciting business in Texas, engaging in other persistent courses of conduct in Texas, recruiting Texas residents for employment, and deriving substantial revenue from the infringing goods and services it has provided to persons and entities in Texas.

15. On information and belief, within this State and during the term of the Patents-in-Suit, Apple offered for sale and sold products embodying the patented inventions, thereby committing acts of patent infringement alleged herein. Apple did so through its own website, through Apple Store retail locations in this District, and through national and regional retailers and wireless carriers with stores in this District. On information and belief, Apple also provides warranty service, technical support, software updates, and cloud services to purchasers and users of those products who reside in this District.

16. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because Apple has committed acts of infringement in this District and has regular and established places of business in this District.

17. Apple maintains one of its largest operations anywhere in Austin, Texas, within this District. In December 2018, Apple announced a $1 billion investment in a new 133-acre campus in North Austin that would initially house 5,000 additional employees, with capacity for up to 15,000, and stated that the investment was "expected to make Apple the largest private

employer in Austin."[3] Apple stated at the time that it already employed 6,200 people in Austin, its largest population of employees outside of Cupertino.[4]

18. Apple has continued to expand in this District. In November 2019, Apple announced that it employed approximately 7,000 people in Austin and that it would assemble its Mac Pro in Austin.[5] In 2025, Apple announced that it has "more than 13,000 team members across Texas" and that it is building a second campus in Austin.[6]

19. On information and belief, Apple's Austin facilities include its campuses at 6900 West Parmer Lane, Austin, Texas 78729 and 5505 West Parmer Lane, Austin, Texas 78727. Those campuses are physical places in this District, they are regular and established places of business, and they are Apple's own: Apple owns or leases and occupies them, staffs them with its own employees, holds them out to the public as Apple facilities, and conducts its business from them.

20. Apple also operates Apple Store retail locations in this District, including Apple La Cantera, at 15900 La Cantera Parkway, San Antonio, Texas 78256,[7] and Apple North Star, at 7400 San Pedro Avenue, San Antonio, Texas 78216.[8] On information and belief, Apple also operates

---

[3] *Apple to Build New Campus in Austin and Add Jobs Across the US*, APPLE NEWSROOM (Dec. 13, 2018), https://www.apple.com/newsroom/2018/12/apple-to-build-new-campus-in-austin-and-add-jobs-across-the-us/ (last visited Sept. 25, 2026) (Ex. 7).

[4] *See id.*

[5] *Apple Expands in Austin*, APPLE NEWSROOM (Nov. 20, 2019), https://www.apple.com/newsroom/2019/11/apple-expands-in-austin/ (last visited Sept. 25, 2026) (Ex. 8).

[6] *Apple Increases U.S. Commitment to $600 Billion, Announces Ambitious Program*, APPLE NEWSROOM (Aug. 2025), https://www.apple.com/newsroom/2025/08/apple-increases-us-commitment-to-600-billion-usd-announces-ambitious-program/ (last visited Sept. 25, 2026) (Ex. 9).

[7] *Apple La Cantera*, APPLE, https://www.apple.com/retail/lacantera/ (last visited Sept. 25, 2026) (Ex. 10).

[8] *Apple North Star*, APPLE, https://www.apple.com/retail/northstar/ (last visited Sept. 25, 2026) (Ex. 11).

Apple Stores at Barton Creek Square, 2901 South Capital of Texas Highway, Austin, Texas 78746, and at Cielo Vista Mall, 8401 Gateway Boulevard West, El Paso, Texas 79925. At each of those stores, Apple employees display, demonstrate, offer for sale, sell, set up, and service Apple products, including the Accused Products described below.

21. Apple's products, including each category of Accused Products, are also sold and serviced through Apple-authorized channels in the Midland-Odessa Division. The Best Buy stores at 2511 West Loop 250 North, Midland, Texas 79705, and at 6300 East Highway 191, Odessa, Texas 79762, each house an "Apple Shop," which is described as a "store-within-a store for all things Apple: Mac, iPad, iPhone, Apple TV and more."[9] Each of those stores is also an Apple Authorized Service Provider, with "Agents who are certified in servicing and repairing Apple devices."[10]

22. Acts of infringement occurred at those facilities. On information and belief, during the term of the Patents-in-Suit, Apple personnel at its Austin campuses and at its Apple Stores in this District used the Accused Products, including by pairing Apple Watches and AirPods with iPhones, connecting iPhones to CarPlay-equipped vehicle displays, connecting Apple TV devices to televisions, configuring those devices, signing them into Apple accounts, installing software and firmware updates, and synchronizing data with Apple's servers, in the course of engineering, product testing, demonstration, training, sales, and customer support. Each such use placed the portable device, the terminal, and the communications network node into the configuration recited

---

[9] *Best Buy Midland, 2511 W Loop 250 N*, BEST BUY, https://stores.bestbuy.com/tx/midland/2511-w-loop-250-n-280.html (last visited Oct. 5, 2026) (Ex. 44); *Best Buy Odessa, 6300 E Highway 191*, BEST BUY, https://stores.bestbuy.com/tx/odessa/6300-e-highway-191-1526.html (last visited Oct. 5, 2026) (Ex. 45).

[10] *See* Exs. 44, 45.

in the asserted claims, and each therefore constituted a use of the claimed inventions in this District. On information and belief, Apple also sold the Accused Products from its Apple Stores in this District during that period.

23. Apple has repeatedly litigated patent infringement actions in this District, and this District is a familiar and convenient forum for it.

## THE IOENGINE PATENTS-IN-SUIT

### A. The Patents-in-Suit

24. U.S. Patent No. 9,059,969 ("the '969 patent") was filed on August 6, 2013 and issued on June 16, 2015. U.S. Patent No. 10,397,374 ("the '374 patent") was filed on September 22, 2017 and issued on August 27, 2019. U.S. Patent No. 10,447,819 ("the '819 patent") was filed on September 22, 2017 and issued on October 15, 2019. U.S. Patent No. 10,972,584 ("the '584 patent") was filed on September 23, 2019 and issued on April 6, 2021. U.S. Patent No. 10,992,786 ("the '786 patent") was filed on July 18, 2019 and issued on April 27, 2021. Each of the five patents is titled "Apparatus, Method and System for a Tunneling Client Access Point," and each names Scott McNulty as its sole inventor. The '969, '374, '819, '584, and '786 patents are referred to collectively as the "Patents-in-Suit."[11] True and correct copies of the '969, '374, '819, '584, and '786 patents are attached as Exhibits 1, 2, 3, 4, and 5, respectively.

25. The Patents-in-Suit are members of a single patent family and share a common specification. The '969 patent issued from U.S. Patent Application Ser. No. 13/960,514, a continuation of U.S. Patent Application Ser. No. 12/950,321, filed November 19, 2010 (issued as U.S. Patent No. 8,539,047), which was itself a continuation of U.S. Patent Application Ser. No.

---

[11] All specification citations are to the '969 patent, though all patents have corresponding disclosures.

10/807,731, filed March 23, 2004 (issued as U.S. Patent No. 7,861,006). The ’374 and ’819 patents issued from U.S. Patent Application Ser. Nos. 15/712,714 and 15/712,780, each a continuation of U.S. Patent Application Ser. No. 14/721,540, filed May 26, 2015 (issued as U.S. Patent No. 9,774,703), which was a continuation of the application that issued as the ’969 patent. The ’584 patent issued from U.S. Patent Application Ser. No. 16/579,169, filed September 23, 2019, and the ’786 patent issued from U.S. Patent Application Ser. No. 16/516,244, filed July 18, 2019, each a continuation in the same chain. Each of the Patents-in-Suit therefore claims priority to the application filed on March 23, 2004.

26. IOENGINE owns all rights and title to the Patents-in-Suit, including the right to recover damages for past infringement. Each of the Patents-in-Suit is valid and enforceable.

### B. The State Of Portable Computing When Mr. McNulty Filed His Application

27. The specification of the Patents-in-Suit opens by describing the trend that prompted the invention: “[c]omputing devices have been becoming smaller over time.”[12] In the early 2000s, the smallest computing devices were personal digital assistants, which “usually come with a touch screen, an input stylus and/or mini keyboard, and battery source” and “typically, have storage capacities around 64 MB.”[13]

28. Those devices were an unsatisfying compromise. As the specification explains, although portable computing systems existed, “no effective solution to securely access, execute, and process data [wa]s available in an extremely compact form.”[14] PDAs, “which are considered among the smallest portable computing solution, are bulky, provide uncomfortably small user

[12] *See* Ex. 1, ’969 patent, at 1:19.

[13] *See id.* at 1:21-24.

[14] *See id.* at 2:26-28.

interfaces, and require too much power to maintain their data."[15]

29. They were also expensive and constrained. "Current PDA designs are complicated and cost a lot because they require great processing resources to provide custom user interfaces and operating systems," and "current PDAs are generally limited in the amount of data they can store or access."[16]

30. The specification identifies the gap that no one had filled. "No solution exist[ed] that allow[ed] users to employ traditional large user interfaces they are already comfortable with, provide[d] greater portability, provide[d] greater memory footprints, dr[ew] less power, and provide[d] security for data on the device."[17] Solving all five of those problems at once, in a device small enough to carry in a pocket, is the technical problem to which the Patents-in-Suit are directed.

**C. Mr. McNulty's Invention**

31. Mr. McNulty's solution, which the specification calls a tunneling client access point or "TCAP," inverted the conventional relationship between a small device and a large one. Rather than build a better small screen, the portable device borrows a large one. The disclosed TCAP "is very easy to use; at most it requires the user to simply plug the device into any existing and available desktop or laptop computer,"[18] "through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals, while the TCAP itself, otherwise, provides storage, execution, and/or processing resources."[19]

32. Because the portable device supplies its own storage and processing, it does not

---

[15] *See* Ex. 1, '969 patent, at 2:28-31.

[16] *See id.* at 2:31-35.

[17] *See id.* at 2:35-39.

[18] *See id.* at 2:40-42.

[19] *See id.* at 2:43-46.

need the power and complexity that made PDAs bulky: "the TCAP requires no power source to maintain its data and allows for a highly portable 'thumb' footprint."[20] The specification describes the result as a technical advance, stating that "the above-identified problems of limited computing devices are overcome and a technical advance is achieved in the art of portable computing and data access."[21]

33. The larger device that supplies the user interface is what the specification calls an access terminal, and what the claims call a terminal. It may be "any number of computing devices such as servers, workstations, desktop computers, laptops, portable digital assistants (PDAs), and/or the like."[22] Indeed, "[t]he type of AT used is not important other than the device should provide a compatible mechanism of engagement to the TCAP and provide an operating environment for the user to engage the TCAP through the AT."[23]

34. The specification describes several ways for the portable device to connect to the terminal, and it is not limited to a physical connection. In one embodiment "the TCAP provides a universal serial bus (USB) connector through which it may plug into an AT."[24] In others, "the TCAP may employ Bluetooth, WiFi and/or other wireless connectivity protocols to connect with ATs that are also so equipped,"[25] and "the TCAP may use Bluetooth to establish a wireless connection with a number of ATs" or "may employ WiFi."[26]

35. Once connected, program code delivered by the portable device drives an

[20] *See* Ex. 1, '969 patent, at 2:46-48.

[21] *See id.* at 2:52-55.

[22] *See id.* at 3:47-49.

[23] *See id.* at 3:49-52.

[24] *See id.* at 3:53-54.

[25] *See id.* at 3:55-57.

[26] *See id.* at 5:41-43.

interactive user interface on the terminal's screen. In an embodiment, the terminal "provides Java and/or Windows runtime environments, which allows the TCAP to interact with the input/output mechanisms of the AT,"[27] the user is "presented with a login prompt" on the terminal's display,[28] and "[o]nce the TCAP has engaged with an AT, it can provide the user with access to its storage and processing facilities."[29]

36. The invention also reaches beyond the terminal to resources on a communications network. "If the AT is connected to a communication network 113, the TCAP may then communicate beyond the AT,"[30] and "the TCAP can provide extended storage and/or processing resources by engaging servers" across that network.[31] To the user, "the contents of the TCAP 130 appear on the AT as being contained on the TCAP 125 even though much of the contents may actually reside on the servers 115, 120 and/or the servers' storage facilities 105."[32]

37. Tunneling can be used to preserve the security of the data the portable device carries. "[T]he TCAP 'tunnels' data through an AT. The data may be provided through the AT's I/O for the user to observe without it actually residing on the AT."[33] And "the TCAP may tunnel data through an AT across a communications network to access remote servers without requiring its own more complicated set of peripherals and I/O."[34] By "providing the equivalent of a plug-n-play virtual private network (VPN), the TCAP provides certain kinds of accessing of remote data

---

[27] *See* Ex. 1, '969 patent, at 3:58-60.

[28] *See id.* at 4:39.

[29] *See id.* at 3:62-63.

[30] *See id.* at 3:64-65.

[31] *See id.* at 3:66-67.

[32] *See id.* at 4:21-24.

[33] *See id.* at 4:25-27.

[34] *See id.* at 4:27- 30.

in an easy and secure manner that was unavailable in the prior art."[35]

38. The claims of the Patents-in-Suit capture three related architectures drawn from that disclosure. In the first, the portable device reaches a communications network node through the network connection of the terminal. In the second, the portable device reaches the network node over a network connection of its own. In the third, it can do either. The '969 patent claims the first architecture, the '819 and '584 patents claim the second, and the '374 and '786 patents claim the second and the third.

## COMPLIANCE WITH 35 U.S.C. § 287

39. IOENGINE has complied with the marking requirements of 35 U.S.C. § 287 with respect to each of the Patents-in-Suit, to the extent they apply.

40. IOENGINE did not itself make, use, offer for sale, sell, or import any product that practices any of the Patents-in-Suit after the issuance of each of the respective Patents-in-Suit. IOENGINE therefore has no marking obligation of its own under 35 U.S.C. § 287.

41. IOENGINE has granted a single license to Interactive Media Corporation ("IMC"), which sells secure USB storage devices under the Kanguru brand name. That license, entered into in May 2018, contains a marking requirement.

42. On information and belief, IMC has marked all of its products that practice any of the Patents-in-Suit—including as relevant here, the Kanguru Defender line of secure memory devices with the '969 patent—continuously since the license was entered into. IMC marks those products in accordance with 35 U.S.C. § 287(a) by including the word "Pat." together with the internet address https://www.kanguru.com/pages/our-partners on the product packaging. That webpage identifies IOENGINE patents, including the '969 patent, and associates it with the

[35] *See* Ex. 1, '969 patent, at 2:48-51.

licensed products.[36] IOENGINE has made reasonable efforts to monitor the marking of these products. On information and belief, neither the Kanguru Defender products nor other IMC products practice the ’374, ’819, ’584, or ’786 patents.

43. On information and belief, there are no other products sold for or under IOENGINE besides IMC’s Kanguru Defender products that practice any of the Patents-in-Suit or are subject to a marking requirement. IOENGINE has thus complied with the marking requirements of 35 U.S.C. § 287 with respect to each of the Patents-in-Suit, to the extent they apply. Further, IOENGINE has provided constructive notice of the ’969 patent under 35 U.S.C. § 287(a) and is entitled to recover damages for infringement occurring up to six years before the filing of this Complaint, as provided by 35 U.S.C. § 286.

## ACCUSED PRODUCTS

44. The “Accused Products” are four categories of Apple portable devices, together with the Apple software and the Apple servers and services with which those devices communicate: Apple’s smartwatches, Apple’s wireless earbuds, Apple’s iPhone smartphones, and Apple’s Apple TV streaming devices.

45. *Smartwatches*. The accused smartwatches (“Smartwatch Accused Products”) include without limitation the Apple Watch Series, Apple Watch SE, and Apple Watch Ultra lines of products, and all other Apple smartwatches with similar capabilities and functionalities as described herein. All Apple Watch models are exemplary, though the Apple Watch Ultra 2 is primarily analyzed herein. Each is a portable device with its own processor, memory, and storage: Apple specifies that the Apple Watch Ultra 2 contains an “S9 SiP with 64-bit dual-core processor”

[36] *Our Partners*, KANGURU, https://www.kanguru.com/pages/our-partners (last visited Sept. 25, 2026) (Ex. 12).

and "64GB capacity," together with "LTE and UMTS" cellular connectivity, "Wi-Fi 4 (802.11n)," and "Bluetooth 5.3."[37] As Apple explains, "[y]our Apple Watch uses Wi-Fi and Bluetooth to communicate with your paired iPhone. If you have cellular, your watch can also stay connected through a cellular network."[38]

46. An iPhone running Apple's Watch application is a terminal within the meaning of the Patents-in-Suit. It necessarily has a processor; an input component and an output component, namely its touchscreen; a network communication interface, namely its Wi-Fi and cellular radios; and a memory storing executable program code, namely the Watch application, which when executed presents a graphical interactive user interface on the iPhone's touchscreen. Apple directs users to set up an Apple Watch through an iPhone, instructing them to "[m]ake sure your iPhone has Bluetooth turned on, and that it's connected to Wi-Fi or a cellular network."[39] A user manipulates elements of the Watch application interface to pair the watch and the iPhone, to update the software on the watch, to manage notifications and settings, and to select music and other content to be synchronized with the watch.[40] And on Apple Watch Series 6 and later, "Apple Watch Mirroring allows you to see and control your Apple Watch screen from your paired iPhone."[41]

---

[37] *Apple Watch Ultra 2 - Tech Specs*, APPLE SUPPORT, https://support.apple.com/en-us/111832 (last visited Sept. 25, 2026) (Ex. 13).

[38] *About Bluetooth, Wi-Fi, and cellular on your Apple Watch*, APPLE SUPPORT, https://support.apple.com/en-us/109319 (last visited Sept. 25, 2026) (Ex. 14).

[39] *Set up your Apple Watch*, APPLE SUPPORT, https://support.apple.com/en-us/109015 (last visited Sept. 25, 2026) (Ex. 15).

[40] *Add music to Apple Watch*, APPLE WATCH USER GUIDE, https://support.apple.com/guide/watch/add-music-apd483798d11/watchos (last visited Sept. 25, 2026) (Ex. 16).

[41] *Turn on Apple Watch Mirroring*, IPHONE USER GUIDE, https://support.apple.com/guide/iphone/turn-on-applewatch-mirroring-iph9827f4f4a/ios (last visited Sept. 25, 2026) (Ex. 17).

47. *Earbuds.* The accused earbuds ("Earbud Accused Products") include without limitation the AirPods, AirPods Pro, and AirPods Max lines of products, and all other Apple wireless earbuds and headphones with similar capabilities and functionalities as described herein. All AirPods models are exemplary, though the AirPods Pro 2 is primarily analyzed herein. Each is a portable device with its own processor, memory, and storage: Apple specifies that the AirPods Pro 2 contain the "Apple H2 headphone chip" and "Bluetooth 5.3 wireless technology."[42]

48. An iPhone paired with an Earbud Accused Product is a terminal within the meaning of the Patents-in-Suit. Apple instructs the user to "open the charging case, and hold it next to your iPhone. A setup animation appears on your iPhone," and then to "[t]ap Connect."[43] Thereafter, the iPhone's Settings application presents an interactive user interface through which the user controls the earbuds; Apple instructs the user to "go to the Settings app" and "[t]ap the name of your AirPods" to change the earbuds' listening modes, controls, and other settings.[44] The iPhone also supplies the earbuds' connection to Apple's servers: Apple explains that AirPods "[f]irmware updates are delivered automatically while your AirPods are charging and in Bluetooth range of your iPhone, iPad, or Mac that's connected to Wi-Fi."[45]

49. *Smartphones.* The accused smartphones ("Smartphone Accused Products") include without limitation every iPhone model compatible with Apple CarPlay, from the iPhone 5 through the iPhone 16e, and all other Apple smartphones with similar capabilities and functionalities as

---

[42] *AirPods Pro 2 - Tech Specs*, APPLE SUPPORT, https://support.apple.com/en-us/111851 (last visited Sept. 25, 2026) (Ex. 18).

[43] *Connect your AirPods and AirPods Pro to your iPhone*, APPLE SUPPORT, https://support.apple.com/en-us/104989 (last visited Sept. 25, 2026) (Ex. 19).

[44] *Change the settings of your AirPods and AirPods Pro*, APPLE SUPPORT, https://support.apple.com/en-us/108764 (last visited Sept. 25, 2026) (Ex. 20).

[45] *About firmware updates for AirPods*, APPLE SUPPORT, https://support.apple.com/en-us/106340 (last visited Sept. 25, 2026) (Ex. 21).

described herein.[46] All iPhone models are exemplary, though the iPhone 15 is primarily analyzed herein. Each is a portable device with its own processor, memory, storage, and network connection: Apple specifies that the iPhone 15 contains the "A16 Bionic chip," up to 512GB of storage, a 6.1-inch touchscreen display, 5G and LTE cellular radios, "Wi-Fi 6 (802.11ax)," and "Bluetooth 5.3."[47]

50. Apple CarPlay is integrated into those iPhones. As Apple explains, "CarPlay is a smarter, safer way to use your iPhone while you drive. You can get directions, make calls, send and receive messages, and enjoy your favorite music. All on your car's built-in display."[48] An iPhone connects to a CarPlay-compatible vehicle either through the vehicle's USB port or wirelessly, by joining the vehicle's CarPlay network.[49] The vehicle infotainment system is a terminal within the meaning of the Patents-in-Suit: it has a processor, a display, an input component in the form of a touchscreen, knobs, or buttons, and a memory storing program code. As Apple explains, "CarPlay also works with your car's controls — knobs, buttons, touchpad, or touchscreen."[50]

51. In that configuration the iPhone supplies the processing, the storage, and the network connection, while the vehicle supplies the screen and the controls. Apple tells developers that "[w]hen a person runs your app from their vehicle, the system generates and hosts your app's

---

[46] *CarPlay*, APPLE, https://www.apple.com/ios/carplay/ (last visited Sept. 25, 2026) (Ex. 22).

[47] *iPhone 15 - Tech Specs*, APPLE SUPPORT, https://support.apple.com/en-us/111831 (last visited Sept. 25, 2026) (Ex. 23).

[48] *See* Ex. 22.

[49] *Use CarPlay with your iPhone*, APPLE SUPPORT, https://support.apple.com/en-us/108415 (last visited Sept. 25, 2026) (Ex. 24).

[50] *See* Ex. 22.

interface for you."[51] A user manipulates elements of the CarPlay interface on the vehicle display to place calls, send and receive messages, select navigation destinations, and choose media, and each such manipulation causes a communication to be transmitted to the iPhone, which in turn executes program code and communicates with Apple's servers and third-party servers. The results of those communications are then presented back on the vehicle display.

52. *Streaming devices.* The accused streaming devices ("Streaming Device Accused Products") include without limitation the Apple TV HD and Apple TV 4K lines of products, and all other Apple streaming devices with similar capabilities and functionalities as described herein. All Apple TV models are exemplary, though the Apple TV 4K (3rd generation) is primarily analyzed herein. Each is a small, self-contained device with its own processor, memory, and storage: Apple specifies that the Apple TV 4K (3rd generation) contains the "A15 Bionic chip," is offered with "64GB (Wi-Fi model)" or "128GB (Wi-Fi + Ethernet model)" of storage, and connects through "HDMI 2.1," "Wi-Fi 6 (802.11ax)," "Bluetooth 5.0 wireless technology," and, on one model, "Gigabit Ethernet."[52]

53. An Apple TV is used with a television or other display, which is a terminal within the meaning of the Patents-in-Suit. Apple instructs the user to "[p]lug your Apple TV into power and connect it to your TV with an HDMI cable," and explains that "[t]o set up your Apple TV, you need personal internet, a TV or other display with an HDMI port, and an HDMI cable."[53] The television has a processor, a display, and a memory storing program code. The Apple TV generates

[51] *CarPlay*, APPLE DEVELOPER DOCUMENTATION, https://developer.apple.com/documentation/carplay (last visited Sept. 25, 2026) (Ex. 25).

[52] *Apple TV 4K (3rd generation) - Tech Specs*, APPLE SUPPORT, https://support.apple.com/en-us/111839 (last visited Sept. 25, 2026) (Ex. 26).

[53] *Set up your Apple TV 4K or Apple TV HD*, APPLE SUPPORT, https://support.apple.com/en-us/102451 (last visited Sept. 25, 2026) (Ex. 27).

its interactive user interface, including the tvOS Home Screen and the menus of the apps and content the user selects from it, and presents that interface on the television's display. The television can also control the Apple TV: Apple explains that "[i]f your TV or receiver supports HDMI-CEC, Apple TV uses the HDMI connection to allow it to be controlled by your TV or receiver remote."[54] The Apple TV reaches Apple's servers and third-party content servers over its own Wi-Fi or Ethernet connection.

54. The communications between the Accused Products, their terminals, and Apple's servers are secure. Apple explains that Bluetooth pairing is "[t]he process for creating one or more shared secret keys," and that its Bluetooth implementation provides "[e]ncryption" for "[m]essage confidentiality."[55] Apple states that when an Apple Watch is paired with an iPhone, "iPhone and Apple Watch exchange keys," and that "all communications between iPhone and Apple Watch are encrypted."[56] And Apple states that "[d]ata moving between the user's devices and iCloud servers is separately encrypted in transit with TLS."[57] On information and belief, the Accused Products' other communications with Apple's servers and third-party servers are likewise protected using Transport Layer Security and the link-layer encryption specified by the Wi-Fi and Bluetooth standards.

---

[54] *If you can't control your Apple TV with your home theater or universal remote*, APPLE SUPPORT, https://support.apple.com/en-us/108789 (last visited Sept. 25, 2026) (Ex. 28).

[55] *Bluetooth security*, APPLE PLATFORM SECURITY, https://support.apple.com/guide/security/sec82597d97e/web (last visited Sept. 25, 2026) (Ex. 29).

[56] *System security for watchOS*, APPLE PLATFORM SECURITY, https://support.apple.com/guide/security/system-security-for-watchos-secc7d85209d/web (last visited Sept. 25, 2026) (Ex. 30).

[57] *iCloud security overview*, APPLE PLATFORM SECURITY, https://support.apple.com/guide/security/icloud-security-overview-secacde2d0da/web (last visited Sept. 25, 2026) (Ex. 31).

## ALLEGATIONS OF PATENT INFRINGEMENT

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 9,059,969

55. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

56. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the ’969 patent, including the right to recover damages for past infringement. The ’969 patent is valid and enforceable.

57. On information and belief, Apple has infringed the ’969 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 4 and 10 of the ’969 patent, including the Smartwatch Accused Products, the Earbud Accused Products, and the Smartphone Accused Products.

58. During the infringing time period, those products met every limitation of at least claim 1 of the ’969 patent, which recites:

> 1. A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:
> (a) an external communication interface configured to enable the transmission of communications between the portable device and the terminal;
> (b) a processor; and
> (c) a memory having executable program code stored thereon, including:
> (1) third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and

establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal network communication interface; and

(2) fourth program code which is configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface;

wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

59. Each Smartwatch Accused Product was a portable device configured to communicate with a terminal, namely a paired iPhone running the Watch application. Apple directs users to set up an Apple Watch through an iPhone: the user brings the watch near the iPhone, and the iPhone displays the message "Use your iPhone to set up this Apple Watch," together with a "Continue" user interface element that the user manipulates to proceed:[58]




[58] *See* Ex. 15.

60. The terminal comprised a processor, an input component, an output component, a network communication interface, and a memory storing executable program code. An iPhone paired with a Smartwatch Accused Product necessarily has a processor, input and output components in the form of a touchscreen, a network communication interface in the form of Wi-Fi and cellular radios, and a memory storing the Watch application. The iPhone 15, for example, contains the "A16 Bionic chip," a touchscreen display, and Wi-Fi and cellular radios.[59]

61. The terminal memory stored first program code which, when executed by the terminal processor, presented an interactive user interface on the terminal output component. The Watch application presents that interface on the iPhone's touchscreen, and Apple instructs users to operate the watch through it. To add music to the watch, for example, Apple directs the user to "[g]o to the Apple Watch app on your iPhone" and to "[n]avigate to albums and playlists you want to sync to your Apple Watch."[60] To update the watch's software, Apple directs the user, "[o]n your iPhone, open the Apple Watch app," and then to "[t]ap General, then tap Software Update."[61]

62. The terminal memory also stored second program code which, when executed by the terminal processor, provided a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface. Apple instructs the user updating the watch through the iPhone to "[m]ake sure that your iPhone is connected to Wi-Fi" and to "[k]eep your iPhone near your Apple Watch throughout the update."[62] And Apple explains that, to support apps that

---

[59] *See* Ex. 23.

[60] *See* Ex. 16.

[61] *Update your Apple Watch*, APPLE SUPPORT, https://support.apple.com/en-us/108926 (last visited Sept. 25, 2026) (Ex. 32).

[62] *See id.*

need streaming data, the watch's communications are protected "using either the Apple Identity Service (IDS) provided by the paired iPhone or a direct internet connection."[63]

63. Each Smartwatch Accused Product had an external communication interface configured to enable the transmission of communications between the portable device and the terminal, namely its Bluetooth and Wi-Fi radios. Apple explains that "[y]our Apple Watch uses Bluetooth when your iPhone is near, which conserves power. If Bluetooth isn't available, your Apple Watch will try to use Wi-Fi."[64] Each Smartwatch Accused Product also had a processor and a memory having executable program code stored thereon; the Apple Watch Ultra 2, for example, contains a "S9 SiP with 64-bit dual-core processor" and "64GB capacity."[65]

64. The memory of each Smartwatch Accused Product stored third program code which, when executed by the portable device processor, provided a communications node on the portable device to coordinate with the communications node on the terminal, established a communications link between the portable device and the terminal, and facilitated communications to the terminal and to a communications network node through the terminal network communication interface. Apple's security documentation describes that link: pairing is "secured using a secret encoded in an animated pattern," after which "iPhone and Apple Watch exchange keys" and "all communications between iPhone and Apple Watch are encrypted."[66] That link carries the watch's traffic to Apple's servers through the iPhone's network connection; as Apple cautions, "[s]ome apps might not update without a connection to your iPhone."[67]

---

[63] *See* Ex. 30.
[64] *See* Ex. 14.
[65] *See* Ex. 13.
[66] *See* Ex. 30.
[67] *See* Ex. 14.

65. The memory of each Smartwatch Accused Product also stored fourth program code configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface. When a user manipulates the Watch application on the iPhone touchscreen to add music, update the watch software, or change the watch's settings, the iPhone sends a message to the watch, which in turn causes code on the watch to execute, including code that retrieves the selected content or software update and communicates with Apple's servers using the iPhone's network connection. Apple confirms, for example, that the selected "[m]usic is added when Apple Watch is near your iPhone."[68]

66. Each Smartwatch Accused Product was accordingly configured to facilitate communications through the communications node on the terminal and the terminal network interface to a communications network node, such as Apple's iCloud, Apple Music, and software update servers. Apple explains that a cellular watch uses its own connection when the paired iPhone is unavailable: "[w]ith a cellular connection, you can make calls and use data or apps when you don't have your iPhone or Wi-Fi."[69] Apple likewise explains that it is "[w]hen Apple Watch and iPhone are out of range" that the watch "connects directly to iCloud and Gmail servers to fetch mail, as opposed to syncing mail data with the paired iPhone over the internet."[70] When the paired iPhone is nearby, each Smartwatch Accused Product reaches Apple's servers through the iPhone's network connection.

67. The Earbud Accused Products separately met every limitation of claim 1. Each Earbud Accused Product was a portable device configured to communicate with a terminal,

[68] *See* Ex. 16.

[69] *See* Ex. 14.

[70] *See* Ex. 30.

namely a paired iPhone. Apple instructs the user to open the AirPods charging case and "hold it next to your iPhone," whereupon "[a] setup animation appears on your iPhone," and to "[t]ap Connect."[71]

68. The terminal comprised a processor, an input component, an output component, a network communication interface, and a memory storing executable program code. An iPhone paired with an Earbud Accused Product necessarily has a processor, input and output components in the form of a touchscreen, a network communication interface in the form of Wi-Fi and cellular radios, and a memory storing iOS and its Settings application.[72]

69. The terminal memory stored first program code which, when executed by the terminal processor, presented an interactive user interface on the terminal output component. The iPhone's Settings application presents an interface through which the user controls the paired earbuds. Apple instructs the user, for example, to "go to the Settings app," "[t]ap the name of your AirPods," and then select the listening modes that the earbuds' press-and-hold control will use; Apple explains that, "[b]y default, when you press and hold the force sensor on the stem of your left or right AirPod, your AirPods switch between Active Noise Cancellation and Transparency mode."[73]

70. The terminal memory also stored second program code which, when executed by the terminal processor, provided a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface. Apple explains that AirPods "[f]irmware updates are delivered automatically while your AirPods are charging and in Bluetooth range of your iPhone,

[71] *See* Ex. 19.
[72] *See* Ex. 23.
[73] *See* Ex. 20.

iPad, or Mac that's connected to Wi-Fi," and instructs the user who wishes to update the firmware to "[c]onnect your iPhone, iPad, or Mac to Wi-Fi."[74] The iPhone's Bluetooth and networking software is the communications node through which that firmware travels from Apple's servers to the earbuds.

71. Each Earbud Accused Product had an external communication interface configured to enable the transmission of communications between the portable device and the terminal, namely its Bluetooth radio; Apple specifies "Bluetooth 5.3 wireless technology" for the AirPods Pro 2.[75] Each Earbud Accused Product also had a processor and a memory having executable program code stored thereon: the AirPods Pro 2 contain the "Apple H2 headphone chip,"[76] and each AirPods model stores the firmware that Apple identifies by version number and updates over the air.[77]

72. The memory of each Earbud Accused Product stored third program code which, when executed by the portable device processor, provided a communications node on the portable device to coordinate with the communications node on the terminal, established a communications link between the portable device and the terminal, and facilitated communications to the terminal and to a communications network node through the terminal network communication interface. Apple instructs the user to "[m]ake sure that your AirPods are connected via Bluetooth to your iPhone" before updating their firmware.[78] The same link carries the earbuds' location to Apple's servers: Apple explains that "[n]earby devices securely send the location of your missing AirPods

---

[74] *See* Ex. 21.
[75] *See* Ex. 18.
[76] *See id.*
[77] *See* Ex. 21.
[78] *See id.*

to iCloud, so that you can find where they are."[79]

73. The memory of each Earbud Accused Product also stored fourth program code configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface. When the user changes the earbuds' listening modes or controls in the iPhone's Settings application, the iPhone transmits the selection to the earbuds, and code on the earbuds executes to apply it; thereafter, when the user presses and holds the stem, the earbuds switch among the listening modes the user selected.[80]

74. Each Earbud Accused Product was accordingly configured to facilitate communications through the communications node on the terminal and the terminal network interface to a communications network node. The earbuds have no network connection of their own; their firmware updates, their association with the user's Apple Account, and their location reports all pass through the paired iPhone's network connection. Apple explains that "[i]f you're signed in to iCloud, your AirPods are set up automatically with any of your supported devices that are signed in to iCloud with the same Apple Account."[81]

75. The Smartphone Accused Products separately met every limitation of claim 1 when operated with a CarPlay-equipped vehicle. Each was a portable device configured to communicate with a terminal, namely the vehicle's infotainment system. Apple instructs the user to connect the iPhone to the vehicle's USB port or, for wireless CarPlay, to join the vehicle's CarPlay network

---

[79] *Find your lost AirPods with Find My*, APPLE SUPPORT, https://support.apple.com/en-us/109020 (last visited Sept. 25, 2026) (Ex. 33).

[80] *See* Ex. 20.

[81] *See* Ex. 19.

from the iPhone's Wi-Fi settings.[82]

76. The terminal comprised a processor, an input component, an output component, a network communication interface, and a memory storing executable program code. A CarPlay-compatible infotainment system has a processor, a built-in display, a touchscreen or other controls, and a memory storing program code. Many such systems also include a network communication interface in the form of an embedded cellular modem and Wi-Fi hotspot. Ford, for example, advertises an in-vehicle Wi-Fi hotspot with "[s]upport for up to 10 personal devices, up to 50ft away from[] your vehicle."[83] General Motors' OnStar service likewise explains that its "built-in Wi-Fi® Hotspot" "turns your vehicle into a reliable mobile hub" and that "[u]p to 18 devices can be connected simultaneously."[84]

77. The terminal memory stored first program code which, when executed by the terminal processor, presented an interactive user interface on the terminal output component. CarPlay presents directions, calls, messages, and music "[a]ll on your car's built-in display," and the user operates that interface through "your car's controls."[85]

78. The terminal memory also stored second program code which, when executed by the terminal processor, provided a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface. For wireless CarPlay, the iPhone joins a Wi-Fi

---

[82] *See* Ex. 24.

[83] *Available Wi-Fi Hotspot*, FORD, https://www.ford.com/support/category/ford-app/available-wifi-hotspot/ (last visited Sept. 25, 2026) (Ex. 34).

[84] *Built-in Wi-Fi Hotspot FAQ*, ONSTAR, https://www.onstar.com/support/faq/wi-fi-hotspot (last visited Sept. 25, 2026) (Ex. 35).

[85] *See* Ex. 22.

network provided by the vehicle.[86] On information and belief, when that vehicle also provides an internet-connected Wi-Fi hotspot, the vehicle's CarPlay software and Wi-Fi access point provide such a node, and the iPhone's communications with Apple's servers and third-party servers are carried through the vehicle's network connection. iPhone users have reported exactly that behavior, describing a phone connected to wireless CarPlay that is "trying and failing to get its data over the WiFi connection to the car."[87]

79. Each Smartphone Accused Product had an external communication interface configured to enable the transmission of communications between the portable device and the terminal, namely its USB port and its Wi-Fi and Bluetooth radios, which together support both wired and wireless CarPlay.[88] Each also had a processor and a memory having executable program code stored thereon, including iOS and its CarPlay software; the iPhone 15, for example, contains the "A16 Bionic chip."[89]

80. The memory of each Smartphone Accused Product stored third program code which, when executed by the portable device processor, provided a communications node on the portable device to coordinate with the communications node on the terminal, established a communications link between the portable device and the terminal, and facilitated communications to the terminal and to a communications network node through the terminal network communication interface. That code includes the CarPlay software that establishes the CarPlay session over USB or over the vehicle's CarPlay Wi-Fi network, which Apple allows the user to set

[86] *See* Ex. 24.

[87] *CarPlay keeps reverting to Wi-Fi hotspot instead of cellular data*, Apple Support Community (Apr. 25, 2025), https://discussions.apple.com/thread/256047683 (last visited Sept. 25, 2026) (Ex. 36).

[88] *See* Ex. 24.

[89] *See* Ex. 23.

to "Auto-Join."[90]

81. The memory of each Smartphone Accused Product also stored fourth program code configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface. When the user selects a destination, places a call, dictates a message, or chooses music on the vehicle display, the head unit transmits the resulting command to the iPhone, and the iPhone executes the corresponding code, including code that requests directions, messages, or media from Apple's servers and third-party servers.

82. Each Smartphone Accused Product was accordingly configured to facilitate communications through the communications node on the terminal and the terminal network interface to a communications network node, as described in the preceding paragraphs.

83. The Smartwatch, Earbud, and Smartphone Accused Products also met every limitation of claim 2 of the '969 patent, which depends from claim 1 and recites "wherein the fourth program code which, when executed by the portable device processor, is configured to cause a communication to be transmitted to the communication network node."

84. The fourth program code of each of those products, when executed by the portable device processor, was configured to cause a communication to be transmitted to a communication network node. As described above, when the user selects music or a software update for a Smartwatch Accused Product in the Watch application, code on the watch executes to retrieve the selected content or update from Apple's servers, and Apple confirms that the selected "[m]usic is added when Apple Watch is near your iPhone."[91] When the user taps "Connect" to set up an

[90] *See* Ex. 24.

[91] *See* Ex. 16.

Earbud Accused Product, the iPhone transmits that command to the earbuds, and code on the earbuds executes to complete the pairing. On information and belief, that code causes the earbuds' identifying information to be transmitted through the iPhone to Apple's servers, which associate the earbuds with the user's Apple Account so that they are "set up automatically with any of your supported devices that are signed in to iCloud with the same Apple Account."[92] As Apple explains, AirPods "can be associated with one Apple Account to take advantage of features such as automatic device switching and Find My."[93] And when the user selects a destination, places a call, dictates a message, or chooses music on a CarPlay vehicle display, code on a Smartphone Accused Product executes to request the corresponding directions, messages, or media from Apple's servers and third-party servers.

85. The Smartwatch, Earbud, and Smartphone Accused Products also met every limitation of claim 4 of the '969 patent, which depends from claim 2 and recites "wherein the communication caused to be transmitted to the communication network node facilitates the transmission of encrypted communications from the communication network node to the terminal."

86. The communications that those products caused to be transmitted to Apple's servers facilitate the transmission of encrypted communications from those servers back to the terminal. Apple states that "[d]ata moving between the user's devices and iCloud servers is separately encrypted in transit with TLS."[94] Apple likewise states that "Health information is encrypted while

---

[92] *See* Ex. 19.

[93] *See id.*

[94] *See* Ex. 31.

it's stored in iCloud and as it goes between iCloud and your device."[95] Accordingly, the data that Apple's iCloud servers return to the paired iPhone in response to communications from a Smartwatch Accused Product or an Earbud Accused Product, including synchronized health, settings, and location data, is encrypted. On information and belief, Apple's software update servers and the servers that return directions, messages, and media in response to requests made through CarPlay likewise encrypt their responses using Transport Layer Security.

87. The Smartwatch, Earbud, and Smartphone Accused Products also met every limitation of claim 10 of the '969 patent, which depends from claim 2 and recites "wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates synchronizing content on the portable device with content on the communication network node database."

88. Apple's servers comprise databases, and the communications those products caused to be transmitted facilitate synchronizing content on the portable device with content in those databases. For the Smartwatch Accused Products, Apple explains that a paired Apple Watch "can automatically track your Activity, heart rate data, and Mindfulness data," and that "[i]f your Health data syncs over iCloud, deleting data on one device removes it from all synced devices connected to the same iCloud account."[96] For the Earbud Accused Products, Apple explains that the user's "personal profile for Spatial Audio will sync across your Apple devices using end-to-end encryption if you use iCloud,"[97] and that AirPods are "set up automatically with any of your

---

[95] *Manage Health data on your iPhone, iPad, or Apple Watch*, APPLE SUPPORT, https://support.apple.com/en-us/108779 (last visited Sept. 25, 2026) (Ex. 37).

[96] *See id.*

[97] *Listen with Personalized Spatial Audio for AirPods and Beats*, APPLE SUPPORT, https://support.apple.com/en-us/102596 (last visited Sept. 25, 2026) (Ex. 38).

supported devices that are signed in to iCloud with the same Apple Account."[98] For the Smartphone Accused Products, on information and belief, the media, messages, and contacts an iPhone presents through CarPlay are synchronized with the user's Apple Music and iCloud libraries on Apple's servers.

89. On information and belief, and for all the reasons above, Apple infringed at least claims 4 and 10 of the '969 patent.

90. As a result of Apple's infringement of the '969 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Apple's infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 10,397,374

91. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

92. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the '374 patent, including the right to recover damages for past infringement. The '374 patent is valid and enforceable.

93. On information and belief, Apple has infringed the '374 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 1 and 3 of the '374 patent, including the Smartwatch Accused Products, the Smartphone Accused Products, and the Streaming Device Accused Products.

---

[98] *See* Ex. 19.

94. During the infringing time period, those products met every limitation of at least claim 1 of the '374 patent, which recites:

> 1. A portable device configured to communicate with a communications network, the communication network comprising (i) a communications network node, and (ii) a terminal, the terminal comprising a processor, an output component configured to present a graphical interactive user interface comprising at least one user interface element configured to be manipulated by a user to enable control of the portable device, a network interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, presents the graphical interactive user interface by the terminal output component, receives a command resulting from user manipulation of a user interface element of the graphical interactive user interface, and causes a communication to be transmitted to the portable device in response to the command resulting from user manipulation of a user interface element of the graphical interactive user interface, the portable device comprising:
>
> (a) at least one communication interface configured to enable the transmission of communications between the portable device and the communications network;
>
> (b) a processor; and
>
> (c) a memory having executable program code stored thereon, including:
>
> (1) second program code which, when executed by the portable device processor, enables the portable device to cause a communication to be sent to the communications network node;
>
> (2) third program code which, when executed by the portable device processor in response to a communication received from the terminal resulting from user manipulation of a user interface element of the graphical interactive user interface, causes a communication to be transmitted to the communications network node; and
>
> (3) fourth program code which, when executed, affects the presentation of the graphical interactive user interface by the terminal output component;
>
> wherein the portable device is configured to communicate with the terminal and to securely communicate with the communications network node.

95. Each Smartwatch Accused Product was a portable device configured to communicate with a communications network comprising a communications network node and a terminal. The Smartwatch Accused Products communicate with Apple's servers and third-party servers over their own Wi-Fi or cellular connection or through the network connection of a paired

iPhone, and they communicate with the iPhone over Bluetooth and Wi-Fi.[99]

96. The terminal comprised a processor and an output component configured to present a graphical interactive user interface with at least one user interface element that a user manipulates to control the portable device. The paired iPhone's Watch application presents such an interface on the iPhone touchscreen, and a user controls the watch through it, for example by selecting music to sync or by tapping "General" and then "Software Update" to update the watch.[100]

97. The terminal also comprised a network interface and a memory storing first program code which, when executed by the terminal processor, presented the graphical interactive user interface, received a command resulting from the user's manipulation of a user interface element, and caused a communication to be transmitted to the portable device in response. The iPhone necessarily has Wi-Fi and cellular network interfaces,[101] and the Watch application transmits the user's commands to the watch; when the user downloads a software update through the Watch application, for example, Apple explains that the user should "[w]ait for the progress wheel to appear on your Apple Watch."[102]

98. Each Smartwatch Accused Product had at least one communication interface configured to enable the transmission of communications between the portable device and the communications network, a processor, and a memory having executable program code stored thereon. Apple specifies "LTE and UMTS" and "Wi-Fi 4 (802.11n)" connectivity, an "S9 SiP with 64-bit dual-core processor," and "64GB capacity" for the Apple Watch Ultra 2.[103]

---

[99] *See* Ex. 14.

[100] *See* Ex. 32.

[101] *See* Ex. 23.

[102] *See* Ex. 32.

[103] *See* Ex. 13.

99. The memory of each Smartwatch Accused Product stored second program code which, when executed by the portable device processor, enabled the portable device to cause a communication to be sent to the communications network node. Apple explains that the user "can install updates without your iPhone" after making sure "that your watch is connected to Wi-Fi,"[104] and that "[w]hen Apple Watch and iPhone are out of range, Apple Watch connects directly to iCloud and Gmail servers to fetch mail."[105]

100. The memory of each Smartwatch Accused Product also stored third program code which, when executed by the portable device processor in response to a communication received from the terminal resulting from user manipulation of a user interface element of the graphical interactive user interface, caused a communication to be transmitted to the communications network node. When the user manipulates the Watch application or the Apple Watch Mirroring interface on the iPhone, which "allows you to see and control your Apple Watch screen from your paired iPhone,"[106] the iPhone transmits the command to the watch, and the watch executes code that communicates with Apple's servers or third-party servers, for example to retrieve selected content, a software update, or data for the app the user has opened.

101. The memory of each Smartwatch Accused Product also stored fourth program code which, when executed, affected the presentation of the graphical interactive user interface by the terminal output component. After the watch executes a user's command, the Watch application on the iPhone updates to reflect the result, such as the music stored on the watch, the progress and completion of a software update, or the watch's installed apps; and Apple Watch Mirroring

[104] *See* Ex. 32.
[105] *See* Ex. 30.
[106] *See* Ex. 17.

presents the watch's own screen, as it changes, on the iPhone.[107]

102. Each Smartwatch Accused Product was configured to communicate with the terminal and to securely communicate with the communications network node. Apple states that Apple Watch "[h]elps protect data, both on the device and when communicating with a paired iPhone or the internet,"[108] and Apple states that "[d]ata moving between the user's devices and iCloud servers is separately encrypted in transit with TLS."[109]

103. The Smartphone Accused Products separately met every limitation of claim 1 when operated with a CarPlay-equipped vehicle. Each was a portable device configured to communicate with a communications network comprising a communications network node, namely Apple's servers and third-party servers, and a terminal, namely the vehicle's infotainment system.[110]

104. The terminal comprised a processor and an output component configured to present a graphical interactive user interface with at least one user interface element that a user manipulates to control the portable device. CarPlay presents its interface "[a]ll on your car's built-in display," and the user manipulates its elements through "your car's controls — knobs, buttons, touchpad, or touchscreen."[111]

105. The terminal also comprised a network interface and a memory storing first program code which, when executed by the terminal processor, presented the graphical interactive user interface, received a command resulting from the user's manipulation of a user interface element, and caused a communication to be transmitted to the portable device in response.

---

[107] *See* Ex. 17.
[108] *See* Ex. 30.
[109] *See* Ex. 31.
[110] *See* Ex. 22.
[111] *See id.*

CarPlay-equipped vehicles with embedded modems and Wi-Fi hotspots have their own network interfaces.[112] And Apple's own developer materials describe how the head unit transmits the user's commands to the iPhone: on a touchscreen vehicle, the "[c]ar sends x and y coordinates" of each touch to the iPhone:[113]




106. Each Smartphone Accused Product had at least one communication interface configured to enable the transmission of communications between the portable device and the communications network, namely its cellular and Wi-Fi radios, and had a processor and a memory having executable program code stored thereon; the iPhone 15, for example, contains the "A16 Bionic chip" and supports 5G, LTE, and "Wi-Fi 6 (802.11ax)."[114]

107. The memory of each Smartphone Accused Product stored second program code which, when executed by the portable device processor, enabled the portable device to cause a

---

[112] *See* Ex. 35.

[113] *Developing CarPlay Systems, Part 1*, APPLE WORLDWIDE DEVELOPERS CONFERENCE (2016), https://developer.apple.com/videos/play/wwdc2016/722/, at 9:26 (last visited Sept. 25, 2026) (Ex. 39).

[114] *See* Ex. 23.

communication to be sent to the communications network node, and third program code which, when executed in response to a communication received from the terminal resulting from user manipulation of a user interface element, caused a communication to be transmitted to the communications network node. When the user selects a destination, requests music, or dictates a message on the vehicle display, the head unit transmits the command to the iPhone, and the iPhone transmits a request to the Apple servers or third-party servers that supply the directions, media, or messaging service.

108. The memory of each Smartphone Accused Product also stored fourth program code which, when executed, affected the presentation of the graphical interactive user interface by the terminal output component. Apple explains that when a person runs a CarPlay app, "the system generates and hosts your app's interface,"[115] and the iPhone updates the interface displayed by the vehicle to show the route, conversation, or now-playing screen that results from the user's command.

109. Each Smartphone Accused Product was configured to communicate with the terminal and to securely communicate with the communications network node. Apple states that "[d]ata moving between the user's devices and iCloud servers is separately encrypted in transit with TLS."[116] On information and belief, the iPhone's communications with the Apple servers and third-party servers that supply directions, media, and messaging through CarPlay are likewise protected using Transport Layer Security.

110. The Streaming Device Accused Products separately met every limitation of claim 1. Each was a portable device configured to communicate with a communications network

[115] *See* Ex. 25.

[116] *See* Ex. 31.

comprising a communications network node, namely Apple's servers and third-party content servers, and a terminal, namely a television connected to the Apple TV by HDMI.[117]

111. The terminal comprised a processor and an output component configured to present a graphical interactive user interface with at least one user interface element that a user manipulates to control the portable device. The television displays the tvOS Home Screen and the app and content menus that the Apple TV generates, and the user manipulates the elements of that interface to select and play content.

112. The terminal also comprised a network interface and a memory storing first program code which, when executed by the terminal processor, presented the graphical interactive user interface, received a command resulting from the user's manipulation of a user interface element, and caused a communication to be transmitted to the portable device in response. On information and belief, the televisions with which Apple TV devices are used, including smart televisions, include their own Wi-Fi or Ethernet network interfaces. And the television's HDMI-CEC software transmits the user's commands to the Apple TV: Apple explains that "[i]f your TV or receiver supports HDMI-CEC, Apple TV uses the HDMI connection to allow it to be controlled by your TV or receiver remote."[118]

113. Each Streaming Device Accused Product had at least one communication interface configured to enable the transmission of communications between the portable device and the communications network, namely its "Wi-Fi 6 (802.11ax)" radio and, on one model, its "Gigabit Ethernet" port, and had a processor, the "A15 Bionic chip," and a memory having executable program code stored thereon.[119]

---

[117] *See* Ex. 27.

[118] *See* Ex. 28.

[119] *See* Ex. 26.

114. The memory of each Streaming Device Accused Product stored second program code which, when executed by the portable device processor, enabled the portable device to cause a communication to be sent to the communications network node, and third program code which, when executed in response to a communication received from the terminal resulting from user manipulation of a user interface element, caused a communication to be transmitted to the communications network node. When the user selects a title or app using the television's remote, the television transmits the command to the Apple TV over HDMI-CEC, and the Apple TV requests the selected content from Apple's servers or the content provider's servers over its own network connection.

115. The memory of each Streaming Device Accused Product also stored fourth program code which, when executed, affected the presentation of the graphical interactive user interface by the terminal output component. The Apple TV generates each screen of its interface and transmits it to the television for display, updating the displayed interface in response to each of the user's commands.

116. Each Streaming Device Accused Product was configured to communicate with the terminal and to securely communicate with the communications network node. Apple explains that its FairPlay Streaming technology "securely delivers keys to Apple mobile devices, Apple TV and Safari on OS X, which enables playback of encrypted video content."[120]

117. The Smartwatch Accused Products and the Smartphone Accused Products also met every limitation of claim 3 of the '374 patent, which depends from claim 1 and recites "wherein the third program code, when executed by the portable device processor, causes a secure

[120] *FairPlay Streaming Overview*, APPLE DEVELOPER, https://developer.apple.com/streaming/fps/FairPlayStreamingOverview.pdf (last visited Sept. 25, 2026) (Ex. 40) at 4.

communication to be transmitted through the terminal network interface to the communications network node."

118. Claim 1 is practiced when the portable device leverages its own network connection, and claim 3 adds the tunneling architecture in which the portable device instead reaches the network node through the terminal's network interface. The Smartwatch Accused Products practiced both. When the paired iPhone is nearby, the watch reaches Apple's servers through the iPhone's network connection; Apple instructs users updating through the iPhone to "[m]ake sure that your iPhone is connected to Wi-Fi,"[121] and explains that streaming data for watch apps travels through "the Apple Identity Service (IDS) provided by the paired iPhone or a direct internet connection."[122] Those communications are secure: Apple states that "[d]ata moving between the user's devices and iCloud servers is separately encrypted in transit with TLS."[123]

119. The Smartphone Accused Products likewise practiced claim 3 when connected through wireless CarPlay to a vehicle that provides an internet-connected Wi-Fi hotspot. On information and belief, in that configuration the iPhone's secure communications to Apple's servers and third-party servers are carried through the vehicle's network interface, as iPhone users have reported.[124]

120. On information and belief, and for all the reasons above, Apple infringed at least claims 1 and 3 of the '374 patent.

121. As a result of Apple's infringement of the '374 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Apple's

---

[121] *See* Ex. 32.

[122] *See* Ex. 30.

[123] *See* Ex. 31.

[124] *See* Ex. 36.

infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

**COUNT III**
**INFRINGEMENT OF U.S. PATENT NO. 10,447,819**

122. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

123. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the ’819 patent, including the right to recover damages for past infringement. The ’819 patent is valid and enforceable.

124. On information and belief, Apple has infringed the ’819 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claim 184 of the ’819 patent, including the Smartwatch Accused Products, the Smartphone Accused Products, and the Streaming Device Accused Products.

125. During the infringing time period, those products met every limitation of at least claim 184 of the ’819 patent, which recites:

> 184. A portable device configured to communicate with a communications network comprising a communications network node and with a terminal comprising an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user to enable control of the portable device, the portable device comprising:
>
> a. a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein the communications comprise data content transmitted from the communications network node to the portable device;
>
> b. a communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal;
>
> c. a processor configured to stream data content for presentation by the terminal output component; and

d. a memory having executable program code stored thereon, including:

i. first program code which, when executed, presents an interactive user interface on the terminal output component, receives a command resulting from user manipulation of a user interface element of the interactive user interface, and causes a communication to the portable device processor in response to the command resulting from user manipulation of a user interface element of the interactive user interface;

ii. second program code which, when executed by the portable device processor, enables the portable device to communicate with the communications network node;

iii. third program code which, when executed by the portable device in response to a command resulting from user manipulation of a user interface element of the interactive user interface, causes a communication to be transmitted through the portable device network interface to the communications network node; and

iv. fourth program code which, when executed by the portable device, processes data content received from the communications network node through the portable device network interface for transmission through the communications interface to the terminal and presentation by the terminal output component.

126. Each Smartwatch Accused Product was a portable device configured to communicate with a communications network comprising a communications network node, namely Apple's servers and third-party servers, and with a terminal, namely a paired iPhone, whose touchscreen presents an interactive user interface comprising user interface elements that the user manipulates to control the watch. Apple explains that "Apple Watch Mirroring allows you to see and control your Apple Watch screen from your paired iPhone," and that the user "can use touch or assistive features like Voice Control, Switch Control, and more on your iPhone to interact with Apple Watch."[125]

127. Each Smartwatch Accused Product had a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein the communications comprise data content transmitted from the communications

[125] *See* Ex. 17.

network node to the portable device. Apple specifies "LTE and UMTS" and "Wi-Fi 4 (802.11n)" connectivity for the Apple Watch Ultra 2.[126] Over that connection the watch receives data content from Apple's servers, including software updates that Apple explains the user "can install" on the watch "without your iPhone,"[127] and mail that the watch fetches when it "connects directly to iCloud and Gmail servers."[128]

128. Each Smartwatch Accused Product had a communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal. The watch communicates with the paired iPhone over Bluetooth and Wi-Fi,[129] and when Apple Watch Mirroring is on, the watch streams the continuously updated contents of its own screen to the iPhone so that the user can "see and control your Apple Watch screen from your paired iPhone."[130] Apple also explains that the watch's communications with the iPhone support "apps that need streaming data."[131]

129. Each Smartwatch Accused Product had a processor configured to stream data content for presentation by the terminal output component. The Apple Watch Ultra 2 contains an "S9 SiP with 64-bit dual-core processor,"[132] which streams the watch's screen to the iPhone for display during Apple Watch Mirroring.

130. Each Smartwatch Accused Product had a memory having executable program code

---

[126] *See* Ex. 13.
[127] *See* Ex. 32.
[128] *See* Ex. 30.
[129] *See* Ex. 14.
[130] *See* Ex. 17.
[131] *See* Ex. 30.
[132] *See* Ex. 13.

stored thereon, including first program code which, when executed, presents an interactive user interface on the terminal output component, receives a command resulting from user manipulation of a user interface element of that interface, and causes a communication to the portable device processor in response. The Apple Watch Mirroring and Watch application code presents the watch's interface on the iPhone touchscreen, receives the user's touches on that interface, and transmits the resulting commands to the watch.[133]

131. The memory of each Smartwatch Accused Product also stored second program code which, when executed by the portable device processor, enabled the portable device to communicate with the communications network node, and third program code which, when executed in response to a command resulting from user manipulation of a user interface element, caused a communication to be transmitted through the portable device network interface to the communications network node. The watchOS software on each Smartwatch Accused Product includes the networking code with which the watch communicates with Apple's servers over its own Wi-Fi or cellular connection. On information and belief, when the user opens an app or selects content on the watch through the mirrored interface on the iPhone, the watch executes code that requests the corresponding data from Apple's servers or third-party servers, including over its own network interface.

132. The memory of each Smartwatch Accused Product also stored fourth program code which, when executed by the portable device, processed data content received from the communications network node through the portable device network interface for transmission through the communications interface to the terminal and presentation by the terminal output component. The watch processes the data it receives from Apple's servers and third-party servers,

---

[133] *See* Ex. 17.

such as mail, messages, and app content, renders it on the watch's screen, and, during Apple Watch Mirroring, transmits that screen to the iPhone for display.[134]

133. The Smartphone Accused Products separately met every limitation of claim 184. Each was a portable device configured to communicate with a communications network comprising a communications network node, namely Apple's servers and third-party servers, and with a terminal, namely a CarPlay-equipped vehicle infotainment system, whose built-in display presents an interactive user interface comprising user interface elements that the user manipulates to control the iPhone.[135]

134. Each Smartphone Accused Product had a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein the communications comprise data content transmitted from the communications network node to the portable device, namely its 5G, LTE, and Wi-Fi radios,[136] over which the iPhone receives maps, directions, music, and messages from Apple's servers and third-party servers.

135. Each Smartphone Accused Product had a separate communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal, namely its USB connection and its wireless CarPlay connection to the vehicle.[137] Apple's own developer materials show the iPhone streaming video and audio to the car over that connection while the two devices exchange communications over CarPlay's

[134] *See* Ex. 17.
[135] *See* Ex. 22.
[136] *See* Ex. 23.
[137] *See* Ex. 24.

communication protocols:[138]




136. Each Smartphone Accused Product had a processor configured to stream data content for presentation by the terminal output component, such as the iPhone 15's "A16 Bionic chip,"[139] and a memory storing the four sets of program code the claim requires. First program code, including the CarPlay software, presents the interactive user interface on the vehicle display, receives the user's commands, and communicates them to the iPhone's processor; as Apple explains, "the system generates and hosts your app's interface."[140] Second program code enables the iPhone to communicate with Apple's servers and third-party servers. Third program code, executed in response to the user's selection of a destination, song, or message on the vehicle

[138] *Developing CarPlay Systems, Part 1*, APPLE WORLDWIDE DEVELOPERS CONFERENCE (2016), https://devstreaming-cdn.apple.com/videos/wwdc/2016/722x2eefo3u2rp8k8qs/722/722_developing_carplay_systems_part_1.pdf, at 26 (last visited Sept. 25, 2026) (Ex. 41).

[139] *See* Ex. 23.

[140] *See* Ex. 25.

display, transmits a request through the iPhone's cellular or Wi-Fi interface to those servers. And fourth program code processes the maps, audio, and messages the iPhone receives from those servers and streams the resulting video and audio to the vehicle for presentation on its display and speakers.

137. The Streaming Device Accused Products separately met every limitation of claim 184. Each was a portable device configured to communicate with a communications network comprising a communications network node, namely Apple's servers and third-party content servers, and with a terminal, namely a television connected by HDMI, whose display presents the interactive user interface that the user manipulates to control the Apple TV.[141]

138. Each Streaming Device Accused Product had a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein the communications comprise data content transmitted from the communications network node to the portable device, namely its "Wi-Fi 6 (802.11ax)" radio and, on one model, its "Gigabit Ethernet" port.[142] Apple explains that its FairPlay Streaming technology enables "playback of encrypted video content" that "is delivered over the Web using HTTP Live Streaming (HLS)."[143]

139. Each Streaming Device Accused Product had a communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal, namely its "HDMI 2.1" port, which Apple specifies supports "up

---

[141] *See* Ex. 27.

[142] *See* Ex. 26.

[143] *See* Ex. 40 at 4.

to 4K 60-fps HDR video output."[144]

140. Each Streaming Device Accused Product had a processor configured to stream data content for presentation by the terminal output component, namely the "A15 Bionic chip,"[145] and a memory storing the four sets of program code the claim requires. First program code, including tvOS, presents the interactive user interface on the television, receives the user's commands, including commands transmitted by the television over HDMI-CEC,[146] and communicates them to the Apple TV's processor:[147]




141. Second program code enables the Apple TV to communicate with Apple's servers and third-party content servers. Third program code, executed in response to the user's selection of a title, transmits a request through the Apple TV's network interface to those servers, including a request for the content key that FairPlay Streaming uses; Apple explains that "FPS allows a

---

[144] *See* Ex. 26.

[145] *See id.*

[146] *See* Ex. 28.

[147] *How To Connect Apple TV 4K to LG Smart TV!*, YOUTUBE, https://www.youtube.com/watch?v=_Ut7vl5Vfss, at 2:08 (last visited Sept. 25, 2026) (Ex. 42).

content provider to securely deliver an AES 128-bit content key from the provider's key server."[148] And fourth program code processes the video and audio content the Apple TV receives through its network interface, including by decrypting it (Apple explains that "FPS decrypts the encrypted video content with the content key"),[149] and streams the decoded content through the HDMI port to the television for presentation on its display.

142. On information and belief, and for all the reasons above, Apple infringed at least claim 184 of the '819 patent.

143. As a result of Apple's infringement of the '819 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Apple's infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

**COUNT IV**
**INFRINGEMENT OF U.S. PATENT NO. 10,972,584**

144. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

145. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the '584 patent, including the right to recover damages for past infringement. The '584 patent is valid and enforceable.

146. On information and belief, Apple has infringed the '584 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claim 1 of the '584 patent, including the Smartwatch Accused Products, the Smartphone Accused Products,

[148] *See* Ex. 40 at 4.
[149] *See id.*

and the Streaming Device Accused Products.

147. During the infringing time period, those products met every limitation of at least claim 1 of the ’584 patent, which recites:

> 1. A portable device configured to communicate with (i) a communications network comprising a plurality of communications network nodes and (ii) a terminal comprising a processor, an output component, and a memory configured to store program code, including first program code which, when executed by the terminal processer, is configured to facilitate a key exchange between the terminal and the portable device, the portable device comprising:
>
> (a) a network interface configured to enable transmission of communications between the portable device and a communications network node;
>
> (b) a communication interface configured to enable transmission of communications between the portable device and the terminal;
>
> (c) a processor; and
>
> (d) a memory having executable program code stored thereon, including:
>
> (1) second program code which, when executed by the portable device processor, is configured to cause a communication to be transmitted to the terminal to display an interactive user interface by the terminal output component, the interactive user interface comprising at least one user interface element configured to be manipulated by a user to cause the portable device processor to execute stored program code;
>
> (2) third program code which, when executed by the portable device in response to a command resulting from user manipulation of a user interface element of the interactive user interface, is configured to cause a communication to be transmitted to the terminal to affect the display of the interactive user interface by the terminal output component;
>
> (3) fourth program code which, when executed by the portable device processor in response to a command resulting from user manipulation of a user interface element on an interactive user interface, is configured to cause a secure communication to be transmitted through the portable device network interface to a communications network node; and
>
> (4) fifth program code which, when executed by the portable device processor, is configured to (i) process secure data received from the communications network node through the portable device network interface and (ii) cause the processed data to be securely transmitted through the communications interface to the terminal for display by the terminal output component, wherein the portable device is configured to employ a key exchange between the portable device and the terminal to securely transmit the processed data through the communication interface to the terminal.

148. Each Smartwatch Accused Product was a portable device configured to

communicate with a communications network comprising a plurality of communications network nodes, namely Apple's servers and third-party servers, and with a terminal, namely a paired iPhone.[150]

149. The terminal comprised a processor, an output component, and a memory storing program code, including first program code which, when executed by the terminal processor, facilitated a key exchange between the terminal and the portable device. Apple's security documentation explains that during pairing, "iPhone and Apple Watch exchange keys," and that "[e]ach device generates Ed25519 public-private key pair, and during the initial key exchange process, the public keys are exchanged."[151] The Bluetooth link over which that exchange occurs is itself keyed: Apple explains that Bluetooth pairing is "[t]he process for creating one or more shared secret keys":[152]

> **Bluetooth security**
>
> There are two types of Bluetooth in Apple devices, Bluetooth Classic and Bluetooth Low Energy (BLE). The Bluetooth security model for both versions includes the following distinct security features:
>
> - *Pairing:* The process for creating one or more shared secret keys
> - *Bonding:* The act of storing the keys created during pairing for use in subsequent connections to form a trusted device pair
> - *Authentication:* Verifying that the two devices have the same keys
> - *Encryption:* Message confidentiality
> - *Message integrity:* Protection against message forgeries
> - *Secure Simple Pairing:* Protection against passive eavesdropping and protection against man-in-the-middle attacks
>
> Bluetooth version 4.1 added the Secure Connections feature to Bluetooth Classic (BR/EDR) physical transport.

150. Each Smartwatch Accused Product had a network interface configured to enable

---

[150] *See* Ex. 14.

[151] *See* Ex. 30.

[152] *See* Ex. 29.

transmission of communications between the portable device and a communications network node, namely its Wi-Fi radio and, on cellular models, its LTE radio, and a separate communication interface configured to enable transmission of communications between the portable device and the terminal, namely its Bluetooth radio and its Wi-Fi connection to the iPhone.[153] Each also had a processor and a memory having executable program code stored thereon; the Apple Watch Ultra 2 contains an "S9 SiP with 64-bit dual-core processor" and "64GB capacity."[154]

151. The memory of each Smartwatch Accused Product stored second program code which, when executed by the portable device processor, caused a communication to be transmitted to the terminal to display an interactive user interface by the terminal output component, the interface comprising user interface elements that the user manipulates to cause the watch's processor to execute stored program code. With Apple Watch Mirroring, the watch transmits its own interface to the iPhone, and the user can "use touch or assistive features like Voice Control, Switch Control, and more on your iPhone to interact with Apple Watch."[155]

152. The memory of each Smartwatch Accused Product also stored third program code which, when executed in response to a command resulting from user manipulation of a user interface element of the interactive user interface, caused a communication to be transmitted to the terminal to affect the display of the interactive user interface by the terminal output component. When the user taps an element of the mirrored interface on the iPhone, the watch executes the command and transmits its updated screen to the iPhone, so that the user continues to "see and control your Apple Watch screen from your paired iPhone."[156]

---

[153] *See* Ex. 13.
[154] *See id.*
[155] *See* Ex. 17.
[156] *See id.*

153. The memory of each Smartwatch Accused Product also stored fourth program code which, when executed in response to a command resulting from user manipulation of a user interface element, caused a secure communication to be transmitted through the watch's network interface to a communications network node. On information and belief, when the user opens an app or requests content on the watch, including through the mirrored interface, the watch transmits a request to Apple's servers or third-party servers over its own Wi-Fi or cellular connection when it has one, as Apple describes the watch doing when it "connects directly to iCloud and Gmail servers to fetch mail."[157] Those communications are secure: Apple states that "[d]ata moving between the user's devices and iCloud servers is separately encrypted in transit with TLS."[158]

154. The memory of each Smartwatch Accused Product also stored fifth program code which, when executed by the portable device processor, processed secure data received from the communications network node through the watch's network interface and caused the processed data to be securely transmitted through the communication interface to the terminal for display, and each Smartwatch Accused Product was configured to employ a key exchange between the watch and the iPhone to do so. The watch decrypts and processes the data it receives from Apple's servers and third-party servers and renders it on its screen, which Apple Watch Mirroring presents on the iPhone. That transmission is protected with the keys the devices exchanged: Apple explains that after keys have been exchanged, "all communications between iPhone and Apple Watch are encrypted."[159]

155. The Smartphone Accused Products separately met every limitation of claim 1. Each Smartphone Accused Product was a portable device configured to communicate with a

[157] *See* Ex. 30.

[158] *See* Ex. 31.

[159] *See* Ex. 30.

communications network comprising a plurality of communications network nodes, namely Apple's servers and the third-party servers from which it obtains directions, messages, and media, and with a terminal, namely a CarPlay-equipped vehicle infotainment system.[160]

156. The terminal comprised a processor, an output component, and a memory storing program code, including first program code which, when executed by the terminal processor, facilitated a key exchange between the terminal and the portable device. A CarPlay head unit has a processor, a built-in display, and a memory storing program code. Apple's developer materials explain that CarPlay may be established either wired or wirelessly, the latter using both Wi-Fi and Bluetooth:[161]




157. For wireless CarPlay, the head unit and the iPhone pair over Bluetooth and the iPhone joins the vehicle's CarPlay Wi-Fi network.[162] Apple explains that Bluetooth pairing is "[t]he process for creating one or more shared secret keys,"[163] and that WPA2 and WPA3 Wi-Fi

[160] *See* Ex. 22.
[161] *See* Ex. 41 at 96.
[162] *See* Ex. 24.
[163] *See* Ex. 29.

security "authenticate each connection and provide 128-bit AES encryption."[164] On information and belief, the head unit's software performs its side of those key exchanges in establishing the wireless CarPlay link.

158. Each Smartphone Accused Product had a network interface configured to enable transmission of communications between the portable device and a communications network node, namely its cellular and Wi-Fi radios; the iPhone 15, for example, supports 5G and LTE cellular networks and "Wi-Fi 6 (802.11ax)."[165] Each also had a separate communication interface configured to enable transmission of communications between the portable device and the terminal, namely its USB connection to the vehicle and, for wireless CarPlay, its Wi-Fi connection to the vehicle's CarPlay network. Each also had a processor, such as the "A16 Bionic chip,"[166] and a memory storing iOS and its CarPlay software.

159. The memory of each Smartphone Accused Product stored second program code which, when executed by the portable device processor, caused a communication to be transmitted to the terminal to display an interactive user interface by the terminal output component, the interface comprising user interface elements that the user manipulates to cause the iPhone to execute stored program code. With CarPlay, it is the iPhone that generates the interface and the vehicle that displays it; Apple explains that "the system generates and hosts your app's interface for you."[167] The CarPlay interface presents apps and controls "[a]ll on your car's built-in display," and the user manipulates those elements through "your car's controls — knobs, buttons, touchpad,

---

[164] *Security features when connecting to wireless networks*, APPLE PLATFORM SECURITY, https://support.apple.com/guide/security/security-features-connecting-wireless-sec8a67fa93d/web (last visited Sept. 25, 2026) (Ex. 43).

[165] *See* Ex. 23.

[166] *See* Ex. 23.

[167] *See* Ex. 25.

or touchscreen."[168]

160. The memory of each Smartphone Accused Product also stored third program code which, when executed in response to a command resulting from user manipulation of a user interface element of the interactive user interface, caused a communication to be transmitted to the terminal to affect the display of the interactive user interface by the terminal output component. When the user taps an app, selects a destination, or chooses a song on the vehicle display, the head unit transmits that command to the iPhone, and the iPhone transmits an updated interface, such as a route, a conversation, or a now-playing screen, for display by the head unit.

161. The memory of each Smartphone Accused Product also stored fourth program code which, when executed by the portable device processor in response to a command resulting from user manipulation of a user interface element, caused a secure communication to be transmitted through the portable device network interface to a communications network node. When the user requests directions, a message, or music through CarPlay, the iPhone transmits a request over its own cellular or Wi-Fi connection to Apple's servers or third-party servers. Apple states that "[d]ata moving between the user's devices and iCloud servers is separately encrypted in transit with TLS."[169]

162. The memory of each Smartphone Accused Product also stored fifth program code which, when executed by the portable device processor, processed secure data received from the communications network node through the portable device network interface and caused the processed data to be securely transmitted through the communication interface to the terminal for display by the terminal output component, and each Smartphone Accused Product was configured

---

[168] *See* Ex. 22.

[169] *See* Ex. 31.

to employ a key exchange between the portable device and the terminal to do so. The iPhone decrypts and processes the map data, messages, and media it receives from Apple's servers and third-party servers, renders the resulting content, and transmits it to the head unit for display. On information and belief, when CarPlay operates wirelessly, that content is carried over a Wi-Fi link secured with keys exchanged between the iPhone and the head unit.

163. The Streaming Device Accused Products separately met every limitation of claim 1. Each Streaming Device Accused Product was a portable device configured to communicate with a communications network comprising a plurality of communications network nodes, namely Apple's servers and third-party content servers, and with a terminal, namely a television or other display connected to the Apple TV by an HDMI cable.[170]

164. The terminal comprised a processor, an output component, and a memory storing program code, including first program code which, when executed by the terminal processor, facilitated a key exchange between the terminal and the portable device. A television connected to an Apple TV has a processor, a display, and a memory storing program code. On information and belief, a television that displays protected content from an Apple TV implements High-bandwidth Digital Content Protection ("HDCP"), a protocol under which the source device and the display authenticate one another and exchange keys before protected content is transmitted. Apple specifies that the Apple TV 4K "[r]equires HDCP when playing protected content and compatible TV or receiver."[171]

165. Each Streaming Device Accused Product had a network interface configured to enable transmission of communications between the portable device and a communications

[170] *See* Ex. 27.

[171] *See* Ex. 26.

network node, namely its "Wi-Fi 6 (802.11ax)" radio and, on one model, its "Gigabit Ethernet" port, and a separate communication interface configured to enable transmission of communications between the portable device and the terminal, namely its "HDMI 2.1" port.[172] Apple instructs the user to "[p]lug your Apple TV into power and connect it to your TV with an HDMI cable."[173]

166. Each Streaming Device Accused Product had a processor and a memory having executable program code stored thereon, including the tvOS operating system and apps; the Apple TV 4K (3rd generation) contains the "A15 Bionic chip" and 64GB or 128GB of storage.[174]

167. The memory of each Streaming Device Accused Product stored second program code which, when executed by the portable device processor, caused a communication to be transmitted to the television to display an interactive user interface on its screen, including the tvOS Home Screen and app and content menus, whose user interface elements the user manipulates with the remote to cause the Apple TV to execute stored program code. That interface is generated by the Apple TV and displayed by the television.[175]

168. The memory of each Streaming Device Accused Product also stored third program code which, when executed in response to a command resulting from user manipulation of a user interface element of the interactive user interface, caused a communication to be transmitted to the television to affect the display of the interactive user interface. When the user selects an app, browses a catalog, or starts a video, the Apple TV transmits the updated screen to the television for display.

---

[172] *See* Ex. 26.
[173] *See* Ex. 27.
[174] *See* Ex. 26.
[175] *See* Ex. 42.

169. The memory of each Streaming Device Accused Product also stored fourth program code which, when executed in response to a command resulting from user manipulation of a user interface element, caused a secure communication to be transmitted through the portable device network interface to a communications network node. When the user selects protected content, the Apple TV requests the content key from the content provider's key server using Apple's FairPlay Streaming ("FPS") technology. Apple explains that "FPS securely delivers keys to Apple mobile devices, Apple TV and Safari on OS X, which enables playback of encrypted video content," and that "FPS allows a content provider to securely deliver an AES 128-bit content key from the provider's key server."[176]

170. The memory of each Streaming Device Accused Product also stored fifth program code which, when executed by the portable device processor, processed secure data received from the communications network node through the portable device network interface and caused the processed data to be securely transmitted through the communication interface to the terminal for display, and each Streaming Device Accused Product was configured to employ a key exchange between the portable device and the terminal to do so. Apple explains that the content provider encrypts the video "with the content key," and that "FPS decrypts the encrypted video content with the content key."[177] Apple further explains that "FPS always enforces HDCP for each protected content block,"[178] so that the decrypted content is protected for transmission over HDMI to the television using keys exchanged between the Apple TV and the television.

171. On information and belief, and for all the reasons above, Apple infringed at least claim 1 of the '584 patent.

---

[176] *See* Ex. 40 at 4.

[177] *See id.*

[178] *See id.* at 5.

172. As a result of Apple's infringement of the '584 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Apple's infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

## COUNT V
## INFRINGEMENT OF U.S. PATENT NO. 10,992,786

173. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

174. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the '786 patent, including the right to recover damages for past infringement. The '786 patent is valid and enforceable.

175. On information and belief, Apple has infringed the '786 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 1 and 20 of the '786 patent, including the Smartwatch Accused Products, the Smartphone Accused Products, and the Streaming Device Accused Products.

176. During the infringing time period, those products met every limitation of at least claim 1 of the '786 patent, which recites:

> 1. A portable device configured to communicate with (i) a terminal comprising a processor, an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to receive a command resulting from user manipulation of a user interface element of the interactive user interface, affect the presentation of the interactive user interface by the terminal output component in response to the command resulting from user manipulation of a user interface element, and cause a communication to be transmitted from the terminal to the portable device in response to the command resulting from user manipulation of a user interface element and (ii) a

communications network comprising a plurality of communications network nodes, the portable device comprising:

(a) a first communication interface configured to enable transmission of communications between the portable device and the terminal;

(b) a second communication interface configured to enable transmission of communications between the portable device and a communications network node;

(c) a processor; and

(d) a memory having executable program code stored thereon, including

(1) second program code which, when executed by the portable device processor, is configured to facilitate communications through the second communication interface between the portable device and the communications network node; and

(2) third program code which, when executed by the portable device processor in response to a communication received by the portable device from the terminal resulting from user manipulation of a user interface element of the interactive user interface presented by the terminal output component, is configured to cause a communication to be transmitted through the second communication interface to the communications network node.

177. Each Smartwatch Accused Product was a portable device configured to communicate with a terminal, namely a paired iPhone running the Watch application, and with a communications network comprising a plurality of communications network nodes, namely Apple's servers and third-party servers.[179]

178. The paired iPhone was a terminal comprising a processor, an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user, and a memory storing executable program code, including the Watch application. The iPhone 15, for example, contains the "A16 Bionic chip" and a touchscreen display.[180]

179. The terminal memory stored first program code which, when executed by the terminal processor, received a command resulting from user manipulation of a user interface

[179] *See* Ex. 14.

[180] *See* Ex. 23.

element of the interactive user interface, affected the presentation of that interface in response, and caused a communication to be transmitted from the terminal to the portable device in response. When the user adds albums and playlists to the watch in the Watch application, for example, the application adds them "to the Playlists & Albums queue" on the iPhone display and the selection is transmitted to the watch; as Apple explains, "[m]usic is added when Apple Watch is near your iPhone":[181]

> ## Add music using your iPhone
>
> 1. Go to the Apple Watch app on your iPhone.
> 2. Tap My Watch, then tap Music.
> 3. Below Playlists & Albums, tap Add Music.
> 4. Navigate to albums and playlists you want to sync to your Apple Watch, then tap ⊕ to add them to the Playlists & Albums queue.
>
> Music is added when Apple Watch is near your iPhone.
>
> **Tip:** Use the Music app on your iPhone to create playlists specifically for music you want to listen to on your Apple Watch—music that motivates you during a workout, for example. See the Apple Support article How to create a playlist in the Apple Music app.

180. Each Smartwatch Accused Product had a first communication interface configured to enable transmission of communications between the portable device and the terminal, namely its Bluetooth radio, supplemented by its Wi-Fi radio. Apple explains that "[y]our Apple Watch uses Bluetooth when your iPhone is near, which conserves power. If Bluetooth isn't available, your Apple Watch will try to use Wi-Fi."[182]

181. Each Smartwatch Accused Product also had a second communication interface configured to enable transmission of communications between the portable device and a communications network node, namely its own Wi-Fi radio and, on cellular models, its LTE radio. Apple specifies "LTE and UMTS" and "Wi-Fi 4 (802.11n)" connectivity for the Apple Watch

---

[181] *See* Ex. 16.

[182] *See* Ex. 14.

Ultra 2,[183] and explains that "[w]ith a cellular connection, you can make calls and use data or apps when you don't have your iPhone or Wi-Fi."[184]

182. Each Smartwatch Accused Product had a processor and a memory having executable program code stored thereon, including second program code which, when executed by the portable device processor, facilitated communications through the second communication interface between the portable device and the communications network node. The Apple Watch Ultra 2, for example, contains an "S9 SiP with 64-bit dual-core processor" and "64GB capacity,"[185] and its watchOS software includes the networking code with which the watch installs software updates "without your iPhone" over Wi-Fi[186] and "connects directly to iCloud and Gmail servers to fetch mail."[187]

183. The memory of each Smartwatch Accused Product also stored third program code which, when executed by the portable device processor in response to a communication received by the portable device from the terminal resulting from user manipulation of a user interface element of the interactive user interface, caused a communication to be transmitted through the second communication interface to the communications network node. After the user selects music in the Watch application on the iPhone, for example, a Wi-Fi-connected or cellular watch can stream that music from Apple's servers "when you have an internet connection."[188]

184. The Smartphone Accused Products separately met every limitation of claim 1. Each was a portable device configured to communicate with a terminal, namely a CarPlay-

[183] *See* Ex. 13.
[184] *See* Ex. 14.
[185] *See* Ex. 13.
[186] *See* Ex. 32.
[187] *See* Ex. 30.
[188] *See* Ex. 16.

equipped vehicle infotainment system, and with a communications network comprising a plurality of communications network nodes, namely Apple's servers and third-party servers.[189]

185. The vehicle infotainment system is a terminal comprising a processor, an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user, and a memory storing executable program code. CarPlay presents its interface "[a]ll on your car's built-in display," and the user manipulates the elements of that interface through "your car's controls — knobs, buttons, touchpad, or touchscreen."[190]

186. The terminal memory stored first program code which, when executed by the terminal processor, received a command resulting from user manipulation of a user interface element, affected the presentation of the interactive user interface in response, and caused a communication to be transmitted from the terminal to the portable device in response. The head unit's CarPlay software registers each touch or control input, and, as Apple's developer materials explain, the "[c]ar sends x and y coordinates" of each touch to the iPhone.[191]

187. Each Smartphone Accused Product had a first communication interface configured to enable transmission of communications between the portable device and the terminal, namely its USB connection and its wireless CarPlay connection to the vehicle,[192] and a second communication interface configured to enable transmission of communications between the portable device and a communications network node, namely its 5G, LTE, and Wi-Fi radios.[193]

---

[189] *See* Ex. 22.

[190] *See id.*

[191] *See* Ex. 39 at 9:26.

[192] *See* Ex. 24.

[193] *See* Ex. 23.

188. Each Smartphone Accused Product had a processor and a memory having executable program code stored thereon, including second program code which, when executed by the portable device processor, facilitated communications through the second communication interface between the portable device and the communications network node, and third program code which, when executed in response to a communication received from the terminal resulting from user manipulation of a user interface element, caused a communication to be transmitted through the second communication interface to the communications network node. When the user selects a destination, requests music, or dictates a message on the vehicle display, the head unit transmits the command to the iPhone, and the iPhone transmits a request over its own cellular or Wi-Fi connection to the Apple servers or third-party servers that supply the directions, media, or messaging service.

189. The Streaming Device Accused Products separately met every limitation of claim 1. Each was a portable device configured to communicate with a terminal, namely a television connected by HDMI, and with a communications network comprising a plurality of communications network nodes, namely Apple's servers and third-party content servers.[194]

190. The television is a terminal comprising a processor, an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user, and a memory storing executable program code. The television displays the tvOS Home Screen and the app and content menus that the Apple TV generates, and the user manipulates the elements of that interface to select and play content.[195]

191. The terminal memory stored first program code which, when executed by the

[194] *See* Ex. 27.

[195] *See* Ex. 42.

terminal processor, received a command resulting from user manipulation of a user interface element, affected the presentation of the interactive user interface in response, and caused a communication to be transmitted from the terminal to the portable device in response. The television's HDMI-CEC software receives the user's commands from the television remote and transmits them to the Apple TV; Apple explains that "[i]f your TV or receiver supports HDMI-CEC, Apple TV uses the HDMI connection to allow it to be controlled by your TV or receiver remote."[196] Apple likewise specifies that the Siri Remote can "[c]ontrol your TV or receiver via IR or CEC."[197]

192. Each Streaming Device Accused Product had a first communication interface configured to enable transmission of communications between the portable device and the terminal, namely its "HDMI 2.1" port, and a second communication interface configured to enable transmission of communications between the portable device and a communications network node, namely its "Wi-Fi 6 (802.11ax)" radio and, on one model, its "Gigabit Ethernet" port.[198]

193. Each Streaming Device Accused Product had a processor, the "A15 Bionic chip,"[199] and a memory having executable program code stored thereon, including second program code which, when executed by the portable device processor, facilitated communications through the second communication interface between the Apple TV and Apple's servers and third-party content servers, and third program code which, when executed in response to a communication received from the television resulting from user manipulation of a user interface element, caused a communication to be transmitted through the second communication interface to those servers.

---

[196] *See* Ex. 28.

[197] *See* Ex. 26.

[198] *See id.*

[199] *See id.*

When the user selects a title using the television's remote, the Apple TV receives the command over HDMI-CEC and requests the selected content, and the content key that FairPlay Streaming requires, from the content provider's servers over its own network connection.[200]

194. The Smartwatch Accused Products and the Smartphone Accused Products also met every limitation of claim 20 of the '786 patent, which depends from claim 1 and recites "wherein the terminal further comprises a network interface and the portable device is configured to transmit a communication through the terminal network interface to a communications network node."

195. The paired iPhone has its own Wi-Fi and cellular network interface, and Apple instructs the user to make sure that the iPhone is "connected to Wi-Fi or a cellular network."[201] Each Smartwatch Accused Product was configured to transmit communications to Apple's servers through that interface; as Apple cautions, "[s]ome apps might not update without a connection to your iPhone,"[202] and Apple instructs users updating the watch through the iPhone to "[m]ake sure that your iPhone is connected to Wi-Fi."[203]

196. Each Smartphone Accused Product was likewise configured to transmit communications through the network interface of a CarPlay-equipped vehicle that provides an internet-connected Wi-Fi hotspot.[204] On information and belief, when connected to such a vehicle through wireless CarPlay, the iPhone transmits communications to Apple's servers and third-party servers through the vehicle's network interface, as iPhone users have reported.[205]

197. On information and belief, and for all the reasons above, Apple infringed at least

---

[200] *See* Ex. 40.
[201] *See* Ex. 15.
[202] *See* Ex. 14.
[203] *See* Ex. 32.
[204] *See* Ex. 35.
[205] *See* Ex. 36.

claims 1 and 20 of the ’786 patent.

198. As a result of Apple’s infringement of the ’786 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Apple’s infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

## DEMAND FOR JURY TRIAL

199. IOENGINE hereby demands a jury trial on its claims for patent infringement and any and all issues triable of right before a jury.

## PRAYER FOR RELIEF

WHEREFORE, IOENGINE prays for judgment as follows:

A. That Apple has infringed the ’969, ’374, ’819, ’584, and ’786 patents;

B. That Apple be required to pay IOENGINE’s damages in an amount adequate to compensate IOENGINE for Apple’s infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284, as well as any other damages awarded under 35 U.S.C. § 284, with an accounting as needed;

C. That IOENGINE be awarded all statutory and actual damages to which it is entitled, and prejudgment and post-judgment interest;

D. That this case be declared exceptional under 35 U.S.C. § 285 and that IOENGINE be awarded recovery of the costs of this suit, including reasonable attorneys’ fees; and

E. That IOENGINE be awarded such other and further relief as this Court deems just and proper.

Dated: October 30, 2026

Respectfully submitted,

/s/ *Scott L. Cole*

Scott L. Cole (Texas Bar No. 00790481)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
901 S. MoPac Expressway, Bldg. 1, Suite 270
Austin, TX 78746
Telephone: (650) 623-1401
scole@reichmanjorgensen.com

Jaime F. Cardenas-Navia
(*admission request forthcoming*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
650 Fifth Avenue, Suite 2320
New York, NY 10019
Telephone: (212) 381-1965
jcardenas-navia@reichmanjorgensen.com

Michael Caulkins
(*admission request forthcoming*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
mcaulkins@reichmanjorgensen.com

*Attorneys for Plaintiff IOENGINE, LLC*